## NATHAN H. EDGERTON

*v.*

## THE ELECTRIC IMPROVEMENT AND CONSTRUCTION COMPANY.

Under *Corporation Act* §§ 54, 55, providing that nothing but money shall be considered payment of stock, except that directors may buy necessary property, and to the amount of the value thereof issue full-paid stock, marked " Issued for property purchased," the directors of a corporation, the incorporators of which have agreed to give sixty per cent. of the stock to a person for two patents, are justified in refusing to issue such stock, one patent not having been perfected, and the articles made under the other being worthless, and on such refusal this court will not decree specific performance of such contract.

On bill, answer, replication and proofs in open court.

*Mr. Charles S. King* and *Mr. Samuel W. Beldon*, for the complainant.

*Mr. David J. Pancoast*, for the defendants.

GREEN, V. C.

The complainant, claiming to be an inventor of an electric motor, and of other electric machines, including an electric-typographic machine, for which latter an application had been made for a patent, which was then pending, associated himself with nine other gentlemen in the scheme of forming a company for the purpose of manufacturing and putting machines constructed under these patents on the market.

They entered into an agreement, in writing, under date of June 18th, 1890, with the object of organizing a corporation under the laws of New Jersey, with a capital stock of $2,500,000.

It is declared in this agreement that, in consideration of such stock, the complainant proposed to assign his electric motor and other electric machines, including said electro-typograph, with the right to all patents obtained, or to be obtained, therefor.

He also thereby agreed, for a fair cash valuation to be given him, to transfer such machinery and tools as he might have on hand, and to contribute to the treasury of the company, for the purpose of giving it the means of providing a working capital, eighty thousand shares of the capital stock of the company at the par value of $10 per share ; and, further, to dispose of twenty thousand shares of said stock to the subscribers for such numbers of shares as they might severally subscribe for, at the rate of $2 per share, the amount realized by the sale of the twenty thousand shares to be contributed to the treasury of the company.

By this scheme the whole stock of the company was to be issued to the complainant for his patents and inventions, making it fully-paid stock for property purchased, and of this he was to retain sixty per cent. for himself, appropriate thirty-two per cent. as

treasury stock to be held at the par value of $10 a share, and to dispose of eight per cent. to subscribers, who were to receive it at $2 a share.

The agreement of June 18th, 1890, entered into by complainant and his nine associates, after a preamble setting out the facts before stated, contains an agreement on the part of those signing the agreement to subscribe for the number of shares of the capital stock set opposite their respective names, and to pay for the same the sum of $2 per share. A copy of the contract offered in evidence, and marked *Exhibit C 1*, is signed by all the parties, but there is no designation of any shares to be taken set opposite the names of any of the subscribers. This money, it is declared by the agreement, is to be paid to Mr. Harkinson, as temporary treasurer of the company, to be applied to cover the expenses necessary to secure patents; for the construction of three electro-typographical machines for exhibition of their practical uses; the cost of incorporation and defending litigation, and to carry on the manufacture of electric motors or the business of Professor Edgerton, so as to protect the same until transferred to said company to be organized as aforesaid.

Any net profits of said business, after a proper allowance to Professor Edgerton for his personal services as manager, were to be paid over to the treasurer of said company when incorporated. The agreement afterwards states that as the ownership of the invention known as the electro-typographical machine is claimed by the Inter-National Printing Telegraph Company, it is understood and agreed that if that company should succeed in wresting the ownership and patents for said invention from the complainant, or the patent office should refuse to patent it, or if upon a full test being made the invention should not prove to be of any practical value, and it should not do what Professor Edgerton claims it would do, namely, correctly and with due rapidity transmit, receive and record messages,

"then the money paid or to be paid under the terms and conditions hereinbefore stipulated together with the earnings of the motor establishment of the said Edgerton, less such sums expended in defraying the expenses of securing the patents, the charter of incorporation, in defending litigation, or manufac-

turing machines and the exhibition thereof, and the running expenses of said Edgerton's Motor Establishment, including fair wages to said Edgerton, shall be returned to those advancing said money *pro rata*, according to the amount by each advanced, and the company shall be dissolved and all patents and inventions and said motor establishment shall revert to said Nathan H. Edgerton his heirs and assigns,"

with a further provision with reference to foreign patents, which were held by Mr. Harkinson.

At the time this agreement was entered into the complainant had a place of business, consisting of an office, shop or factory, machinery, tools, &c., in which he was carrying on in his own way the business of making electrical apparatus, at 809 Sansom street, Philadelphia. The parties immediately organized as an informal association, preliminary to the formation of the corporation, and this association held their first meeting on June 30th, 1890, at which arrangements were made to supply the complainant with funds looking to his relief from obligations which he had entered into independent of the business of the association. After an interview with the state tax commissioners at Trenton, it was deemed advisable to reduce the capital stock, and at a meeting held on the 10th of October, 1890, it was agreed that the capital should be $1,000,000 instead of $2,500,000, but the disposition to be made of the stock, so far as the percentages of each object was concerned, was to remain as fixed by the original agreement.

On the 11th of November, 1890, the company was incorporated with a capital stock of $1,000,000, divided into one hundred thousand shares of $10 each—there were nine incorporators, including the complainant, each being the holder of a certain number of shares—four hundred and fifty shares being the number to begin business with.

November 12th, 1890, the company was organized by the election of directors and other officers. The complainant was elected a director, and a committee was appointed to value complainant's plant, which by the agreement was to be transferred to the company for cash at an appraisement to be made.

On the 4th of December the complainant, by bill of sale of
that date, transferred his stock in trade, machinery, tools, &c., to
the company, and on the 9th of the same month he assigned his
patents to the company.  Two assessments of $100 each were
made on each of the directors and stockholders to pay expenses,
and the work proceeded under the direction and management of
the complainant.

The company then authorized the complainant to sell such
machines as he had on hand and appropriate the proceeds to the
payment of debts which he had individually incurred while in
business for himself.

Money was from time to time advanced by the associates until
the amount reached some $3,000 or $4,000, when, in order to
secure less expensive quarters, the officers of the company deter-
mined to move from the former headquarters of complainant in
Sansom street to a cheaper building in Front street, in the city of
Philadelphia, and another assessment of $50 was levied.

This move of location was opposed by Professor Edgerton and
he failed to pay any of the assessments which were made by the
directors.

The motors which were constructed and sold, it is alleged, were
worthless and some of them were returned to the company, and
although complainant claimed that he was at work perfecting his
invention of the electro-typographical machine, it remained, until
the time of his examination as a witness in the trial of this cause,
in the condition of an unsuccessful experiment.  The complainant
did not continue to supervise the operations of the company at
their works in Front street, alleging that he was not permitted
by the officers of the company to have any further direction in
the work, upon which point he testified that he had been told by
two of the employes that their instructions were not to admit
him and that if he persisted in coming there they were to either
pay no attention to him or put him off the premises, and that he,
not wishing to subject himself either to such indignity or injury,
refrained from going there.

In the disposition which I am to make of this case this matter
is of no moment, but it is proper to say that the evidence on the

Edgerton v. Electric Improvement &c. Co.

part of the defendant would indicate that the fear of the complainant as to bodily injury was entirely unfounded, and that no action was in fact taken by his associates to prevent him from discharging whatever duty he might have had to perform at the works of the company.

The prayer of the bill is—

*First.* For an accounting of the business and dealings of the company since its incorporation and of its assets and property and of all its liabilities.

*Second.* That a specific performance of the contract may be decreed, and that the defendant, by its proper officers, shall issue to the complainant the shares of the capital stock of said company, legibly stamped "issued for the property purchased" to which complainant is entitled.

*Third.* That the company may be enjoined from selling, transferring, assigning, encumbering or otherwise disposing of the letters patent or application therefor, moneys or effects or any of the property of the corporation.

*Fourth.* That a receiver may be appointed to take into his charge and under his custody and control during the pendency of the suit all the goods, chattels, moneys and effects, rights and credits of the company.

*Fifth.* For other and further relief.

Some of the evidence was directed to the question of the transfer of the personal property by the bill of sale of December 4th, 1890, which the bill charges was inventoried at $2,375. By the contract he was to be paid a fair cash valuation for the machinery and tools which he was to transfer. A portion of these he was afterwards allowed to sell and appropriate the proceeds to the discharge of his own debts, but the whole transaction with reference to the machinery, tools and personal property, the subject matter of the bill of sale, and the price therefor, is a matter with reference to which he has a complete and adequate remedy at law, and it does not, therefore, in my judgment, properly enter into the consideration of this case.

The answer submits that all and every matter and thing in the bill of complaint mentioned and complained of are matters

in respect to which complainant is not entitled to any relief in this court, and it asks that it shall have the same benefit of this defence as if it had demurred to complainant's bill.

There is no standing for the complainant as a stockholder or director, in the present situation, if in any event he could, to demand an account of the business and dealings of the corporation or of its assets or liabilities; so much of the bill as would seem to attempt to put the company on its defence as an insolvent corporation, or one which had abandoned its business, the answer and evidence fully meets and disposes of; while on a proper case made, showing that there was an intention or threat or an attempt so to do, the company might on application of the complainant have been enjoined from disposing of the letters patent which had been assigned to the company, there is nothing to justify the ordering of an injunction in this case, as there is no evidence of any such intention to warrant the filing of a bill for that purpose.

This disposes of three of the prayers for relief, each on its own merits and without regard to the question whether the bill is not subject to the criticism of being multifarious, and leaves the main point of relief sought, and to which the case was specially directed, viz., the specific performance of so much of the agreement as would entitle the complainant to the shares of the capital stock which were to be his individually.

The only thing of substance which the stock of this company was supposed to represent were the patents that had been already issued to the complainant, the value of which does not seem to have been considered by these parties as at all to be compared with the anticipated value of the unsubstantial invention of an electro-typographical machine which Professor Edgerton was confident he could perfect, but for which no patent had at the time of the agreement, or up to the present, been issued.

Our corporation act provides that (section 54) nothing but money shall be considered as payment of any part of the capital stock of any company organized under this act, except as hereinafter provided for the purchase of property; and (section 55) that the directors of any company may purchase property neces-

sary for their business and issue stock to the amount of the value thereof in payment therefor, which stock so issued shall be declared and be taken to be full-paid stock, and shall have legibly stamped on the face thereof, "issued for property purchased."

Judge Depue, in announcing the opinion of the court of errors and appeals in the case of *Wetherbee* v. *Baker, 8 Stew. Eq. 501* (at *p. 512*), says: "The earlier cases held that the contract of the subscribers could only be fulfilled by payment in money. In later cases this doctrine has been relaxed, and stock issued and paid up in work and labor, or in the purchase of property the corporation is authorized to hold, has been held to have been legally issued. Statutes have also been passed authorizing corporations to purchase property needed for their business, and to issue stock in payment for it, or to accept such property in payment for subscriptions to the capital stock. But in all such cases transactions under such powers have been upheld only where the contract for the rendition of services or the purchase of property, payable in stock, has been made in good faith, and the property taken in payment of stock subscriptions has been put in at a fair *bona fide* valuation; and the courts have inflexibly enforced the rule that payment of stock subscriptions is good as against creditors only where payment has been made in money or in what may fairly be considered as money's worth."

Therefore, to justify a corporation in issuing stock under our act for property purchased, there should be an approximation at least in true value of the thing purchased to the amount of the stock which it is supposed it represents.

These parties first estimated, in their agreement, the value of Professor Edgerton's invention at the sum of $2,500,000, which, for some reason which appears to have been developed at an interview with the state tax commissioners, the complainant agreed to dispose of for $1,000,000 in capital stock. As stated, this should have been the *bona fide* value of those inventions to justify the company in issuing full-paid stock representing that amount in payment therefor. These inventions were claimed to have been for an electric motor and for the electro-typographical

machine. The controlling influence of the value of the latter
is unmistakably indicated in the agreement. It provides that if
the company which claimed this invention should succeed in its
effort in wresting the ownership and patents from the com-
plainant, or the patent office should refuse to patent it, or if on
a full test being made it should not prove to be of any practical
value or should not do what the complainant claimed it would
do, then all moneys were to be returned and the concern was to
be wound up.

According to the testimony of some at least of the company,
the motors made by complainant have turned out to be worthless,
and he himself admits that he has not as yet been able to perfect
the electro-typographical machine. In this aspect, what possible
value exists which can be considered as a legal basis for the
issuing of any stock of this corporation? The officers very
properly have never issued a single share. The complainant
now asks this court by its decree to require the company to issue
to him full-paid stock of the company representing a par value
of $600,000, stamped as "issued for property purchased." If
the officers had issued this amount of stock on the unsubstantial
basis indicated, it would have been the duty of this court, if the
question had been properly presented for decision, to have de-
clared that such issue was fraudulent and not authorized by the
true consideration of the act, and it cannot by its decree direct
that to be done which it would thus condemn.

The remedy of specific performance is not a matter of strict
right; "it rests in sound judicial discretion, controlled by estab-
lished principles of equity and exercised upon a consideration of
all the circumstances of each particular case." *Pom. Cont.* § 35.

Under these circumstances, in my judgment the officers of
the company are justified in not having issued any of the stock
of this company as representing the patents and inventions trans-
ferred to it by the complainant, and that the case does not pre-
sent a condition under which the complainant is entitled to a
decree for specific performance.

The complainant's counsel, in his brief, takes the ground that
complainant is entitled to have the corporation wound up in
accordance with the terms of the contract.

Without expressing any opinion upon that question, if it was properly presented, it is sufficient to say that the complainant by his bill presents no such question; there is no such prayer for relief, nor is the bill framed with reference to any such solution of the difficulties between the parties.

The bill should be dismissed.